UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 10 CIV. 9647

---------------------------------------------------X

MARCUS I. WASHINGTON,                      :
                                           :
                      Plaintiff,           :
                                           :          Civil Action No. _____
        v.                                 :
                                           :
WILLIAM MORRIS ENDEAVOR                     :          COMPLAINT
ENTERTAINMENT, LLC; formerly known as      :
the WILLIAM MORRIS AGENCY, JEFF             :          <u>JURY TRIAL DEMANDED</u>
MEADE and SARAH WINIARSKI,                  :
                                           :
                      Defendants.          :
---------------------------------------------------X

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff  Marcus I. Washington (or "Mr. Washington"), as and for his Complaint in this action against

Defendants William Morris Endeavor Entertainment, LLC, formerly known as the William Morris Agency,

LLC, (hereinafter referred to as either "The Company" or "William Morris" or "WMA" or "WME

Entertainment"), Sarah Winiarski ("Winiarski") and Jeff Meade ("Meade"), (collectively, "Defendants"), hereby

alleges as follows:

## NATURE OF CLAIMS

1.      This is an action for declaratory, injunctive and equitable relief, as well as monetary damages,

to redress Defendant's unlawful systemic and individual discriminatory employment practices, including

Defendant's intentional exclusion of minorities from opportunities of employment and advancement which has

spanned over the course of 112 years, as well as the discriminatory treatment and unlawful retaliation

committed against Mr. Washington, due to his race, color and/or perceived national origin and complaints of

discrimination, in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"),

Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York State

[1]

RECEIVED
DEC 22 2010
PRO SE OFFICE

Human Rights Law, New York Executive Law §§ 296 *et seq.* (the "NYSHRL"), and the New York City Human

Rights Law, New York Administrative Code §§ 8-107 *et seq.* (the "NYCHRL").

## JURISDICTION AND VENUE

2.        This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this

action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981 and Title VII.

The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local laws

pursuant to 28 U.S.C. § 1367(a).

3.        Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of

the events or omissions giving rise to this action, including the unlawful employment practices alleged herein,

occurred in this district.

## PARTIES

4.        Marcus I. Washington is a resident of the State of New York, Kings County. At all relevant

times, he met the definition of an "employee" under all applicable statutes.

5.        Founded in 1898, the William Morris Agency (now known as William Morris Endeavor

Entertainment) is one of the largest and most influential talent agencies throughout Hollywood and the world

of entertainment, with a history that spans 112 years and a talent roster that boasts some of America's most

iconic figures including actors, authors, musicians and public figures. In addition to having offices in Beverly

Hills, Nashville, London and Miami, at all relevant times, the Company has had its principal place of business

located at 1325 Avenue of the Americas, New York, New York and regularly transacts business in this district.

6.        At all relevant times, the Defendant William Morris, has met the definition of "employer"

pursuant to 42 U.S.C. 2000e(b), New York State Human Rights Law § 292(5) and New York City Human Rights

Law § 8-102(5).

7.        At all relevant times, Defendants Meade and Winiarski had the authority to make

personnel decisions concerning Mr. Washington's work schedule, assignments and other employment benefits

[2]

as employees within the Human Resources department of the Company's New York office. Defendants Meade and Winiarski also had, and continue to have influence and authority to discipline, including the right to hire and terminate Company employees.

## PROCEDURAL REQUIREMENTS

8.          Mr. Washington filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII, 42 U.S.C. §§ 2000e *et seq.* on June 3, 2010. The charges arise out of the same facts alleged herein, in addition to discrimination on the basis of color and perceived national origin.

9.          After an incomplete investigation by the EEOC, which included the failure of receiving a response from William Morris Endeavor Entertainment, LLC in regards to Mr. Washington's charge of violating Title VII, 42 U.S.C. §§ 2000e *et. seq.,* the EEOC issued a Dismissal and Notice of Rights on September 28, 2010. *See* Exhibit A.

10.          Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

I.      <u>Marcus I. Washington</u>

11.          Marcus I. Washington was a Black and African American Agent Trainee at the William Morris Agency.

12.          Upon moving to New York City in May of 2008, Mr. Washington applied to the Agent Trainee program after learning about the program via the Company's website.  To be accepted into the Agent Trainee program, one goes through a rigorous three step interview process. After sending your resume and cover letter to Human Resources, the first step includes a phone interview conducted by Winiarski. The second step involves an in person interview in which an applicant must pass a spelling/grammar/typing test and then interviews with Pat Galloway – former head of Human Resources – and Meade. The third and final step involves a six to seven person panel interview with various Agents and staff, before being offered the job.

13.     The career path from advancing from Agent Trainee to Agent begins by working in the Mailroom. After a few months of delivering mail and learning the Company's system and traditions, a Trainee is promoted to work upstairs either as a Floater – one who acts in a support staff function while getting opportunities to work with Agents – or becomes an actual Assistant for an Agent. The Assistant could then be promoted to become a Coordinator for their department, or could bypass this step and be promoted to an Agent. Although each individual's trajectory is different within the Company based on a number of factors, the entire process takes an average of three to five years.

14.     On September 2, 2008, Mr. Washington began his first day as an Agent Trainee at the William Morris Agency and was the only Black and/or African American employed at any level of the Agent Trainee program. There were zero African American, Hispanic or Asian Coordinators and zero African American or Hispanic Agents (the "inexorable zero") employed in the New York office during the time of Mr. Washington's employment at the Company. Minorities are overrepresented in areas such as the Mailroom and Support Staff.

15.     Prior to joining the William Morris Agency, Mr. Washington, in three years, received his Bachelor of Science in Communication (B.S.C.) in Media Management & Psychology in May of 2006 and Masters in Music (M.M.) in Music Business and Entertainment Industries in May of 2008 with a 3.892/4.000 GPA, from the University of Miami by the age of 24.

16.     While attending the University of Miami, Mr. Washington at one time held three jobs simultaneously throughout the entertainment industry, giving him a unique advantage and understanding of the business. No Agent Trainee of any race at the William Morris Agency's New York office had the combined education and relevant work experience as Mr. Washington. No Agent Trainee, past or present, has been responsible for bringing a client to the Company *prior* to joining The Company's Agent Trainee program. His qualifications were superior to that of any similarly situated Agent Trainee and were, if anything, comparable to that of an Agent. Most Agent Trainees are recent college graduates with Bachelor degrees and have little to no work experience in the entertainment industry, have no relationships with talent and/or key industry

[4]

figures, and considers this their first "real" job throughout the business. At various times, senior staff at the Company equated the Agent Trainee program to receiving a "Masters" in entertainment.

17.     From June 2004 to December 2008, Mr. Washington was the "Urban Editor" and journalist for a regional and award winning entertainment/fashion publication by the name of *Ego Miami Magazine* (later known as *Six Degrees),* interviewing musical artists, entertainers and sports figures including Lil' Wayne, Jennifer Hudson, Missy Elliott, Serena Williams, Pharrell, Ciara, Nelly Furtado, Keyshia Cole, and Jill Scott to name a few – many who are former or current clients of William Morris.

18.     From July 2005 to October 2006, Mr. Washington served as a publicist for a then unknown producer – Danjahandz – who is now a GRAMMY® Award winning producer whose credits include Madonna, Justin Timberlake, Nelly Furtado, Timbaland, Britney Spears, Keri Hilson, T.I. and other highly successful recording artists throughout urban and pop music.

19.     Mr. Washington worked for the Florida Chapter of The Recording Academy as a GRAMMY® U Student Representative for a program designed to help college students with an interest in music business gain invaluable networking opportunities from industry professionals from August 2007 to May 2008. Within the first four months, Mr. Washington achieved his annual membership goal of 100 new members and by the end of his term, helped the Florida Chapter become number one in student membership throughout the entire country.

20.     In February of 2006, Mr. Washington came across the music of a singer/songwriter by the name of Jazmine Sullivan via the Internet. Mr. Washington believed in her so much that he formed a long distance working relationship with Jazmine and her management – spending two years working in a co-manager capacity that included helping her sign a major recording deal with J Records and President of A&R Peter Edge whose credits include artists Alicia Keys and Dido, arranging studio sessions with multi-platinum producers for her debut album *Fearless,* and contributing to her personal and professional development amongst other things.

21.       While co-managing Jazmine, Mr. Washington also took the initial meeting with S.V.P. of Urban Contemporary Music at William Morris, Cara Lewis, in December of 2007 seeking representation for Jazmine. He also had a conference call with William Morris music Agents Dick Alan and Marshall Reznick (based Beverly Hills) who also expressed interest in representing Jazmine. Shortly after parting ways with Jazmine in a management capacity, she signed with Cara Lewis and the William Morris Agency.

22.       Throughout the entire time Mr. Washington was employed in the Agent Trainee Program, Jazmine Sullivan's career blossomed. The decline in physical album sales has played a pivotal role in the deterioration of the music business, making each year harder for artists and record companies to stay afloat. However, Jazmine was one of the breakthrough new artists of 2008 with the release of her debut album, *Fearless*, which entered the Billboard R&B Album charts at number one in September of 2008. She enjoyed three top ten Billboard R&B singles, including "Need U Bad" produced by Missy Elliott which peaked at #1 on the R&B Billboard chart. By the end of 2010, her album has been certified gold (sales of 500,000 copies or more) by the RIAA, she was the opening act on two national tours from Maxwell and Ne-Yo in addition to headlining solo gigs throughout the country (all booked by Cara Lewis), she became a spokesperson for Cotton (arranged by the commercial department of William Morris), has been nominated three years consecutively for a total of 8 GRAMMY® Awards including 'Best New Artist' and 'Best Contemporary R&B Album," and in December 2010, was the recipient of *Billboard's* 'Rising Star' Award.

23.       To put some of these accomplishments in perspective, in the two years since Jazmine released her debut album, her record company, J Records, has yet to break another new artist that has matched her sales and/or achieved similar critical acclaim. In 2009, out of the 98,000 albums released in the U.S., less than 90, which is less than .1%, sold more than 250,000 copies. And in December 2008, three months after her debut album was released, Jazmine was nominated for a total of 5 GRAMMY® Awards – making her the most nominated new artist and female of the 51st Annual Awards show.

24.       Over the last four years, Mr. Washington has directly worked with some of the music industry's key executives and CEOs that have played an influential role in the overall decline of the music

industry.  However, millions of dollars have been cumulatively amassed by various companies (J Records, Sony

Music, Universal Music Publishing, ASCAP, William Morris and others) and individuals, as a direct result of

Mr. Washington's work for Jazmine's career and insight on the music industry.

**II.      Assisting for Cara Lewis – Senior Vice President of Urban Contemporary Music**

      25.        On September 8, 2008, less than a week of being employed at the Company, Mr.

Washington was asked by Cara Lewis to temporarily become her third Assistant after her Assistant abruptly

quit without giving her two week notice.

      26.        Lewis is a veteran in the business and a high earner for the Company, having represented

some of urban music's biggest acts over the last twenty years including Jay-Z, The Fugees, Eminem, 50 Cent,

Rihanna, Lil' Wayne, Jennifer Hudson and many others. During the meeting, Lewis forewarned Mr.

Washington to not "internalize" anything that happened while working on her desk. Mr. Washington accepted

the opportunity.

      27.        Although Mr. Washington and Lewis had a prior professional relationship, Mr.

Washington didn't know Lewis' reputation inside the Company as being very difficult to work for. Lewis rarely

hired Agent Trainees because of her desk's fast pace and quick turnover. There were little to no opportunities to

be mentored – explaining why no Assistant has been promoted from her desk in twenty years. The work

schedule for her desk was also longer than the rest of the Company and the high volume of calls, deadlines, etc.

created a stressful and intense work environment.

      28.        Unlike the rest of Lewis' Assistants, Mr. Washington had relationships with some of her

clients and their managers *before* he worked at the Company. This created a conflict of interest for both Mr.

Washington and Lewis at times.

      29.        On November 3, 2008, Mr. Washington was relieved from Lewis' desk. Inside her office,

Lewis told Mr. Washington that he's possibly "overqualified" because of his extensive experience and suggested

that he should be a "manager or A&R," essentially someone who is in more control and "creative." Mr.

Washington wasn't without fault – he did make errors – typical of anyone with little formal training trying to

absorb a lot of information in a fast paced environment, with strict rules, all coupled with adjusting to multiple Assistant personalities.

30.     Lewis stated that she felt Mr. Washington was "trying to run his own ship" although Mr. Washington tried to abide by her rules. Because she felt Mr. Washington had a great understanding of urban music, as evident by Jazmine's success, she didn't want to ruin the relationship that had been established.

31.     After parting ways with Lewis, Mr. Washington was told by Meade that he would have to re-enter the Mailroom. For the rest of his time at the Company, Mr. Washington still maintained a great working relationship with Lewis and took the initiative to put his skills to use when he noticed he wasn't being given the same opportunities to succeed within the Company as his White counterparts. This included attending shows and giving feedback and reviews for new and established acts, making suggestions for possible tour lineups, and bringing to her attention or mentioning a host of new urban acts to consider signing such as Nicki Minaj, Drake and J. Cole, as well as numerous artists that she shouldn't sign that would eventually go on to have unsuccessful careers such as Shontelle and Electik Red.

32.     From November 2008 to April 2010, more than five other Assistants either quit or were fired from Lewis' desk.

### III.     Methods Used by The Company to Systemically Exclude Mr. Washington, African Americans and Other Minorities

33.     The Company maintains policies, patterns and/or practices for hiring and promoting its employees that result in the disproportionate hiring and advancement of Whites over equally or more qualified African American and other minority groups. As a result, minorities have been systematically circumvented and excluded from employment and promotion opportunities that are routinely afforded to their White counterparts.

34.     The resulting underrepresentation of African Americans and people of color employed within the Company dwindles at each possible step of the Company's corporate ladder – from Agent Trainee to Assistant to Coordinator and finally to Agent.

35.    In the New York office of the Company, the all White Human Resources staff played an influential role in the assignments, responsibilities and projects given to Agent Trainees and Floaters. Whether based on conscious or implicit bias, the end result is that most Whites were often assigned the most promising opportunities. These more favorable opportunities allowed Whites at the Company to build better relationships with Agents, which in turn propelled their career advancement and in the long term, earned them greater compensation.

36.    These century long policies, patterns and/or practices have had the effect of unfairly benefiting Whites at the Company while depriving minorities an equal opportunity to succeed. The organizational structure of the Company and its institutionally discriminatory policies, patterns and/or practices in turn have given White employees the impression of higher power and seniority that ultimately becomes a self-fulfilling prophecy. As a result, Whites at the Company are viewed more favorably, are more likely to be promoted and ultimately receive higher compensation due to advancement.

**A.    Disparate Impact**

37.    Two years after the *Plessy v. Ferguson* ruling, the William Morris Agency was created. The Company's struggle with racial equality has paralleled that of America's. And while the country has made considerable attempts in creating an environment that's conducive to racial equality, the Company has deliberately and willfully frozen the status quo of prior discriminatory employment practices from its first 63 years of existence. In 2010, African American representation within the New York office of the Company at the Agent level is relatively no different from when the Company overtly discriminated and denied them employment and advancement opportunities pre-1961. At both times, the number has been zero.

38.    In *Griggs v. Duke Power Co.,* 401 U.S. 424 (1971), the Supreme Court held that the prohibition on employment discrimination contained in Title VII of the Civil Rights Act of 1964 barred both intentional discrimination *and* employment practices that had an unintended racially disparate impact. However, with the recent ruling in *Ricci v. DeStefano,* 129 S.Ct., 2658 (2009), it's been suggested by the Supreme Court that disparate impact is possibly unconstitutional and reflects reverse discrimination. In regards

to the latter case, the Company's historical record of flagrant discriminatory employment policies, patterns and/or practices will negate this belief on numbers alone.

39.      The Company will not be able to provide a credible argument to show that the racial disparities within the organization arise out of a job-related business necessity unless that "necessity" is to maintain and preserve control, power, group status hierarchies and White supremacy in our "post-racial" society.

40.      Below, include examples of seemingly neutral policies that have, over the course of a century, created a substantially adverse and disparate impact, resulting in a company culture that fosters and is conducive to systemic and individual disparate treatment. At every stage along the process, a disproportionate number of African Americans and other minorities are disqualified from the opportunity of advancing to Agent.

### I. Hiring Largely Based on Referral & Word of Mouth

41.      As a private business which maintains a high level of confidentiality, the Company is notoriously secretive and thus, has been able to operate with very little public scrutiny or regulation. As a result, its industry dealings, as well as the Company's traditions which include a history of excluding African Americans and other minorities from employment, have successfully remained out of the public's awareness. By hiring mostly on a referral or "who you know" basis in a racially homogenous workplace, the Company has continued to achieve unequal employment outcomes by restricting knowledge about job opportunities and vacancies to channels where minority job candidates are unlikely to hear. These covert tactics of excluding members of historically disadvantaged groups has allowed the Company to continue its fraternal "old white boys network" (which is now simply a "white network"). As a result, hiring and promotions are largely based on nepotism, as opposed to actual merit.

42.      Many Agents are responsible for signing and representing highly successful entertainers that influence and shape popular culture. Such responsibilities give successful Agents enormous power and control, in which many of the Company's executives exhibit Type-A personalities with inflated egos that are out of touch with reality. These impulsive risk takers have a blatant disregard for the law and only care about

maximizing Company profits. Salaries can range from mid five figures for recently promoted Agents to seven figures for more successful and senior Agents.

43.     In the 1940s, the Company's overt practice to exclude people of color was achieved by implementing the requirement that candidates had to have a college degree for the sake of keeping minority applicants to a minimum as referenced by former Agent Larry Auerbach in the book *The Mailroom*. *See Exhibit B*. Seventy years later, that requirement is no longer effective as minorities have made considerable advancements throughout all areas of society, including education by obtaining college and advanced degrees, yet diversity at the Agent Trainee, Coordinator and Agent level of the Company is still eerily non-existent.

44.     The gender and racial composition of Agents and decision makers is positively associated with that of those who are hired, and ultimately promoted within the Company. Research has shown that women are more likely to be promoted when some of the positions above them are filled by women. The same can be said in terms of race. This is evident by the advancements of women within the Company over the last 40 years and is reflected in the large number of females employed within the organization today. The first female Agent Trainee started at the Company in 1975. Thirty five years later, there were 20 female Agents employed in the New York office of the Company when Mr. Washington began in September 2008. The same rate of progress, however, can't be said for African Americans, which further reflects a work culture with a racial superiority complex and deeply rooted discriminatory bias towards African Americans and people of color.

45.     The statistical data presented in paragraphs 51 through 53 and 57 through 61 provides circumstantial evidence that discrimination is the Company's standard operating procedure – the regular, rather than the unusual practice. As a result, these startling figures uncover and expose the clandestine and covert discriminatory practices of the Company and shed light on how the organizational structure and unlawful, institutionally discriminatory practices have resulted in the disparate impact and treatment of African Americans and other racially disadvantaged groups.

## II. Advancement Based on Access to Networks & Mentoring – Not Actual Merit & Ability

46.      The Company's decision makers – mostly Human Resources and Agents – enjoy extremely broad discretion in choosing which Agent Trainees will be promoted to Assistant. Agent Trainees are promoted based on personal preferences, personal relationships, and subjective and biased views of their aptitude and performance. Upon information and belief, promotions at William Morris are intensely political and require the careful cultivation of relationships with key Agents and Assistants, who the vast majority are White. As a result, the Company promotes an overwhelmingly disproportionate number of Whites and passes over equally or more qualified African Americans and people of color. At all levels – hiring, promoting, retaining – the Company has engaged in systemic discriminatory practices.

47.      For the year and a half Mr. Washington was employed by the Company, majority of Whites who started in the Mailroom landed permanent Assistant opportunities, some getting the opportunity to work with multiple Agents. Mr. Washington left the Company as a Floater who was mostly given dead end assignments and/or worked in the Mailroom. The only other African American Agent Trainee hired seven months after Mr. Washington (L. Foster) was considered a "Permanent Floater" for a recently promoted theater Agent and was overlooked for an Assistant opportunity to work with a senior Agent within the department as well.

48.      Networks play a pivotal role in an Agent Trainee's career trajectory within the organization. Networks aid in the Agent Trainee and/or Assistant's progress within the Company by creating informal mentoring, contacts, and relevant information pertaining to advancement. Outnumbered, Human Resources and others created barriers to inclusion for Mr. Washington in a systematic and discriminatory fashion that cut him off from those opportunities while making it appear that it was Mr. Washington's own failures for not being able to advance.

49.      Informal and formal preferences for Whites' own group have led to the continued preservation of existing status hierarchies. Though ostensibly race-neutral, it's intentional and has over time, left African Americans and other minorities at a clear disadvantage, explaining why there were zero African

American or Hispanic Agents (the "inexorable zero") and two Asian Agents in the New York office during the time Mr. Washington was employed and possibly many years before.

**B.**     **Systemic Disparate Treatment**

**I. Historically Homogenous Racial Makeup of the Company**

50.     For almost 50 years, since the passage of the Civil Rights Act of 1964, there has been a shift in the nature of racial prejudice toward the endorsement of equal treatment by race and a repudiation of overt forms of prejudice and discrimination. However, the continuation of discriminatory policies, patterns and/or practices by William Morris demonstrate their true underlying sentiments are nothing short of a superficial commitment to racial equality as reflected by the drastic differences between the racial makeup of the Company and the racial makeup of both New York City and the United States of America.

51.     These statistics help explain why Mr. Washington was the only African American Agent Trainee hired by the Company in September 2, 2008 and captures the Company's mentality towards African Americans and other minorities. *See Exhibit C* for a series of charts detailing the racial makeup of the organization. The continued absence of members of marginalized groups feed stereotypical attitudes, making it harder for the few minorities who have managed to get hired to fit in comfortably.

52.     Job segregation is one of the most institutionalized work practices that reinforce and reify ascriptive disparities. For African American Agent Trainees, the "glass wall" is clearly established between the Agent Trainee and the Assistant, Coordinator and Agent level at the Company, as Coordinators were 100% and Agents were 98% White.

53.     Race is a social construct and doesn't determine one's abilities or capabilities. Yet, based on the historical hiring and promotion policies, patterns and/or practices by the Company, one would conclude that being White gives one the ability or upper hand to recognize, sign and develop talent, explaining why less than 5 out of the 250+ Agents (< 2%) employed within the Company as of April 2010 were African American. The truth however, is that the only reason race was and has remained a pre-requisite for the job of becoming an Agent, has been for the business necessity to exclude.

54.     A work environment with this type of racial composition – one in which there is clear and distinct segregation based on occupation - attenuates and exacerbates the instances of discrimination and provides a key structural context that shapes and maintains inequality within the organization. At the conscious and unconscious level, this clearly establishes a superior and inferior dynamic. It also says to minorities, that the odds of moving up the ranks, no matter how qualified you may be, is slim to none, especially if you are African American or Hispanic.

55.     Majority of the White employees hired at the Agent Trainee level have no relevant work experience in the business and are recent college graduates, hired merely for their passion and interest for entertainment. However, majority of the handful of minorities hired while Mr. Washington was employed had advance degrees and considerable work experience, and as a result, were typically older in age – reflecting the Company's higher than usual standards for hiring minorities compared with Whites.

56.     By systematically discriminating against African Americans and other minority groups, the Company, as a result, has suffered in employee quality by hiring and promoting a number of inferior candidates from the majority in preference to more talented minority job seekers. Hiring and promoting one based on an inherent belief that one's race is a prerequisite for the job creates an environment of subsequent mediocrity, because the talent pool is limited largely to one racial group. This has impacted the Company in a number of ways and helps explain why a number of Agents who have been promoted by the Company in the recent years have yet to sign or develop successful new clients and begins to offer an explanation for the numerous television shows that are being cancelled mid-season due to low ratings, underperforming films in the marketplace, the decline of the Broadway, publishing and touring industries, etc.

## II. African American (and Other Minority) Exclusion: A Pattern and Practice of Discrimination

57.     Another undeniable indicator of the Company's desire to exclude African Americans from employment opportunities is further evident through a close examination of its documented historical record. The first African American hired by the Company – Wally Amos – started in 1961 after protests and pressure from civil rights groups. Amos was promoted to Agent fairly quickly, and after six years working for the

Company in the music division and discovering both successful African American *and* White acts, including The Temptations and Simon & Garfunkel, Amos experienced the glass ceiling after asking to be promoted within the film or television department. He was told that the studios and networks weren't "ready for a black agent." *See Exhibit D.* In his autobiography, Amos is quoted as saying, "What a distressing paradox: I was hired because I was black and now I could not advance because I was black."

58.     In September of 1989, the Company hired former music executive Kevin Harewood as the Associate Vice President of Black and Urban Contemporary Music "in a move to update [the Company's] operations and further its commitment to black music" as reported in *Billboard.* That same year, Lewis was also hired. Harewood resigned after one year at the Company and in the last ten years (and possibly longer), there have been zero African American music Agents employed throughout the Company's North American offices.

59.     After celebrating 101 years of its existence and thirty-two years after Amos' exit, the Company finally felt that the studios were "ready for a black agent," when they promoted its first African American film agent, Charles King, in December 1999. At the time of his promotion, there were a total of six African American Agents "out of 750" employees at the Company.

60.     In the forty-nine years since the first African American was hired by the Company, there have been less than 20 African Americans hired and/or promoted to Agent. Out of this small few, a large percentage of these individuals in the last two decades bypassed the Agent Trainee program and were hired directly as Agents as a result of having numerous years experience and success throughout their respective fields.

61.     The last African American Agent employed at the New York office of the Company – Manie Baron – began in July of 2001. Baron was the first African American literary Agent in the 58 year history of the Company's literary department. He exited the Company in late 2004/early 2005, and since then, there has yet to be another African American Agent employed in the Company's New York office.

62.     The African American Agents specifically referenced in the paragraphs above (as well as others employed over the decades), in addition to the number of highly successful African Americans

executives throughout other areas of the entertainment industry negate antiquated ancestral beliefs and the current reality that Whites are the only group capable at being successful at the corporate level of this business or anything in society. This only occurs because the Company, as well as society, deliberately continues to exclude African Americans, Hispanics, Asians and other minorities from opportunities to excel and show their capabilities.

63.     Furthermore, these discriminatory policies, patterns and/or practices are not by accident. Rather, they are part of an outdated corporate culture that wishes to remain stuck in the past. Since as early as the 1910s, studios and networks throughout the entertainment industry, as well as leading talent agencies including William Morris have faced sporadic public pressure to address these disparities and unfavorable portrayals of African Americans and other minorities throughout the media.

64.     William Morris has intentionally implemented these company-wide policies and practices in its effort to maintain White supremacy and reinforce its power due to its influential role in defining and creating societal and cultural ideologies, norms, values and stereotypes through powerful tools of conditioning and persuasion such as television, film and the media (also comprised predominately by Whites at the decision making and/or executive level), all falling under the guise of "entertainment."

65.     The danger in this is that because there are so few African Americans and other minorities employed at the decision making level of this business, the roles for minorities are limited and character portrayals are generally one-dimensional and stereotypical. For example, for the 2008-09 season, the only minority cast anchoring a new series in primetime television on one of the Big Five networks (ABC, CBS, NBC, FOX and CW) was *The Cleveland Show* – a cartoon, in which the show's main character, Cleveland Brown, ironically voiced by a White actor named Mike Henry. Over the last decade, there has been a decline in the number of minority sitcoms and films – in part because there are few minorities represented at the corporate level of the business to seek out the next wave of creative ideas and/or talent that will cater to minority audiences. Instead, Whites continue to be the gatekeepers although there is clear disconnect between the decision makers and the minority viewing audience.

[16]

66.     While the Company has denied African Americans opportunities of employment and advancement, they have profited immensely from the talents of African American entertainers for over the last seven decades. Notable African American entertainers, past and present, have included Duke Ellington, Sammy Davis Jr., Whitney Houston, Bill Cosby, Halle Berry, Jay-Z, Tyler Perry, Janet Jackson, Denzel Washington, Forest Whitaker, Mariah Carey, Lauryn Hill, Whoopi Goldberg, Serena Williams, Kanye West, Rihanna and many others, who have helped the Company amass millions of dollars in profit. This further demonstrates the Company's plantation-like mentality in which African Americans aren't considered equals in the workplace, but are only of value if Whites retain control and are able to profit from their work.

67.     Due to the Company's discriminatory practices and irrational prejudices against African Americans as equals, the Company has failed to see that there's an actual business necessity for why *more* African Americans should be hired by the Company – to properly cater to needs of a neglected African American client roster and to maximize revenues within this profitable market segment. Unfortunately, because of a lack of concern by the Company for African Americans overall, a number of African American entertainers and musicians have exited from the Company since April 2010.

68.     Two of the objectives of Congress with the enactment of Title VII were to achieve equality of employment opportunities and remove barriers that operated in the past to favor White employees over non-White employees. Although there has been good intention, the law has been ineffective in achieving those goals, especially with the deregulation of the private sector over the last forty years. On April 27, 2009, the William Morris Agency merged with Endeavor Talent Agency creating William Morris Endeavor Entertainment – a company with an estimated revenue of $325 million. At the time of the merge, Endeavor had zero African American Agents employed throughout its entire company (the "inexorable zero"). This reflects both an industry-wide, as well larger societal issue in regards to companies engaging in unlawful and blatantly exclusionary employment practices, which ultimately limit the number of opportunities minorities receive in the workplace.

[17]

69.     By not disrupting the status quo, these ascriptive inequalities have led to the creative destruction of the business. Over the course of a year and a half, the New York office went from a very vibrant and active workplace to becoming a dull, dead and depressing place. The few Agents that Mr. Washington got to assist for had very little workload and were pretty self-sufficient. For example, one of the Agents Mr. Washington assisted for had a total of three phone calls throughout a ten hour workday. The Agent apologized numerous times due to embarrassment at how slow her desk was. Another instance included Mr. Washington being privy to an email in which a retailer wanted to sell back books to the Agent because there was no demand for the product in the marketplace and the retailer was at a financial loss. This was typical of many Agents by the time Mr. Washington left the organization.

70.     There is a strong basis in the evidence to conclude that the disproportionately low number of African Americans, as well as other minorities, hired, promoted and retained by the Company are statistically significant and did not occur due to chance – further reflecting a company whose organizational structure and institutional practices encourage and promote discriminatory biases to be carried out by its employees.

**C.      Individual Disparate Treatment**

**I. Low Visibility & High Frequency of Dead-End Assignments**

71.     Visibility with Agents at the Company can increase an Agent Trainee's access to career opportunities, improve an Agent's information about their potential, and reduce the perception of risks associated with promoting Agent Trainees from different demographic groups. Occupational segregation not only limits visibility, but it also perpetuates negative stereotypes about minorities' competence and capabilities. Concentrating Mr. Washington in lower-level and marginalized jobs limited his visibility and strategic networks, and reinforced negative stereotypes about his capabilities and work performance to both Assistants and Agents although his ideas and advice had proven to be lucrative for the Company.

72.     After re-entering the Mailroom in November 2008, Mr. Washington humbled himself and did whatever was asked and required of him. He was hardworking, a team player and went over and beyond to

get the job done. Mr. Washington was supportive of his peers and developed friendships with his coworkers – which extended outside of the workplace.

73.      Mr. Washington made a series of attempts to become an Assistant for other Agents within the Company, yet was continually passed over for Whites with less experience and qualifications. On November 10, 2008, Mr. Washington applied for the Assistant position of corporate consulting Agent, Patti Kim, and was passed on for a White girl with less education credentials and work experience who would later leave the Company after a few months on the desk.

74.      On March 6, 2009, Mr. Washington applied for the Assistant position for commercials Agent, Strand Conover, and was also passed on for a White male with less education credentials and work experience. Conover stated to Mr. Washington that the reason the other candidate was chosen, was because he applied for another Agent's desk in the same department – establishing an earlier interest than Mr. Washington. However, that opportunity occurred while Mr. Washington was assisting for Cara Lewis.

75.      Given Mr. Washington's advanced education and relevant work experience throughout the business, Mr. Washington should not have been hired into the Agent Trainee program because he was overqualified. If the Company didn't want to hire Mr. Washington as an Agent or Coordinator, they shouldn't have hired him at all because he was doomed from the beginning given the structure of the program. The Company was fully aware that Mr. Washington's qualifications exceeded that of any Trainee, especially being that he was responsible for getting a client signed to the Company prior to joining the organization. Yet, in order to compete with the pool of inexperienced White Trainees, Mr. Washington would've had to essentially dumb down his skills so that Agents wouldn't feel threatened or intimidated while trying to establish the superior/inferior relationship generally found between most Agents and Assistants in the Company's competitive work environment.

76.      After being turned down for his two top choices, it was a blow to Mr. Washington's confidence. Mr. Washington knew that his opportunities were now limited and that it would take time before another desk could become available. While waiting for another opportunity to arise, Mr. Washington

[19]

continued to demonstrate his skills, strong work ethic and knowledge about the business. While most Agent Trainees were learning the ropes, answering phone calls and doing other administrative tasks, Mr. Washington continued to create and develop profitable ideas for the Company.

77.     In the month of March, Mr. Washington created a branding/marketing presentation for the commercial department for R&B singer Keri Hilson who was gearing the release of her debut album, ...In A Perfect World. Mr. Washington personally knew Keri prior from his work as a publicist to one of her producers Danjahandz, three years before she was signed by the Company. She would eventually go on to become one of the breakout new artists of 2009 – in which was nominated for multiple GRAMMY® Awards, in addition to having her debut album certified gold by the RIAA.

78.     This presentation put Keri on the radar of Agents outside the music department for possible endorsement opportunities. Mr. Washington presented the PowerPoint presentation to Strand Conover on March 27, 2009 in which Conover raved about Mr. Washington's work and later forwarded the presentation to the entire commercial department. Conover even had Mr. Washington write the generic pitch letter that accompanied the presentation to potential corporate clients.

79.     Later in the year, Keri became the spokeswoman for Avon's cosmetic line – a deal created by the Company – however, Mr. Washington was never informed by anyone in the Company. This made Mr. Washington hesitant and cautious to present ideas to members of the Company.

80.     While still in the Mailroom, on April 2, 2009, Mr. Washington was asked to meet with Strand Conover and Assistants of the commercial department to develop a tour sponsorship presentation for Kanye West's proposed 2009 North American tour. In less than two weeks turnaround, Mr. Washington created a brand new presentation that the year before, had to be created by the Company's "professional" marketing staff based in Beverly Hills. Mr. Washington would then become the "go-to" guy to create PowerPoint presentations, mostly for the Company's "urban" roster of talent including artists like Ne-Yo and Solange Knowles.

81.     Mr. Washington realized that there was no real difference between the work of a Manager and an Agent once inside the Company – except that for the latter, one must be licensed to procure bookings by law in states such as California and New York. A number of Agents employed within the Company didn't sign new acts and worked solely on procuring bookings for the Company's existing roster. Because of the Company's dominance, Agents rarely had to actively secure booking engagements for their clients because buyers throughout the world were desperately trying to enlist the Company's services. The client's rates and contracts issued were fairly standard and many of the deals and transactions occurred without Agents and buyers meeting face to face – further highlighting the point that race is irrelevant to the logistics of the job.

82.     After five months working in the Mailroom, Mr. Washington was promoted to work upstairs as a Floater on April 6, 2009. Floaters provide support wherever need be within the Company. Tasks range from covering for Assistants who may be out sick for the day to doing "special projects" of various kinds. Each morning of the workday, Floaters are given their assignments by Winiarski – who is in charge of scheduling and delegating tasks.

83.     For majority of the year as a Floater (April 2009 – April 2010), Mr. Washington was given dead end assignments that involved working more with support staff (mailroom, accounting, reception, business affairs, IT, etc.) or being an Assistant's Assistant, than getting the opportunity to work with/for Agents. Although Whites were also given similar assignments, the frequency in which Mr. Washington and the other African American Agent Trainee were assigned these tasks exceeded that of Whites significantly.

84.     At one point, Mr. Washington was assigned to work in the IT department for two months – having no formal understanding or training in fixing computers and other technological devices such as providing Blackberry support. Mr. Washington's day would involve "fixing" problems such as simply plugging the computer into the power outlet for those who said their computer would no longer work, simply plugging in the cell phone charger correctly who said their phones no longer worked and performing other remedial tasks that the staff were too lazy to try to fix on their own.

85.     Personal relationships with Winiarski and favoritism created better assignments and more opportunities to work on desks for Whites. An example being one White Floater, B. Singer, who went out of his way to be nice to Winiarski was allowed to float for a recently hired television Agent who didn't need an Assistant at the time. Company policy was that a recently promoted Agent would have to wait a certain amount of time before receiving an Assistant, yet Winiarski placed Singer on the Agent's desk for weeks on end, which prevented him from having to work in the Mailroom and created more opportunities for Singer to be seen, network and build relationships with those in his department of interest.

86.     Neither of the two African American Agent Trainees were promoted to Assistant at the time Mr. Washington was employed with the Company, although both had been employed with the Company for over a year (another instance of the "inexorable zero" in the area of promotion). Nearly every White Agent Trainee, and subsequently, Floater hired under WME Entertainment, was promoted to Assistant.

87.     Over a period of time, Mr. Washington began to feel Meade and Winiarski were constantly assigning him dead end assignments to impair his interest in the Company so that he would quit on his own accord or to make him leave involuntarily as a result of not being able to advance to Assistant. The experience left Mr. Washington with feelings of disappointment, embarrassment, grief, wounded pride and dignity, as well as aided in the progression of his stress induced gastrointestinal problems, and ultimately made him lose the passion for the entertainment business that he worked so hard and dedicated so much of his life to, amongst other things.

## II. Blatant Lies Caught Via Email

88.     Emails are one of the preferred methods of communication by employees of the Company. Email communication has been found to evoke more extreme, more revealing and less socially desirable content – suggesting that inhibitions consistent with the norms of interpersonal communication are often relaxed because emails provide a certain level of privacy and confidentiality. Instead of explicitly discriminating, emails offer another alternative for Agents and decision makers to communicate and hide their discriminatory biases.

89.     On July 31, 2009, Mr. Washington was told by Winiarski that he would be working in the

Special Services department the following week and would have to receive training from Chris Walsh's

Assistant (Lisa Goins) at 2:30 PM. Prior to that, he was given the assignment to cover for Jeff Googel's Assistant

until 1 PM because she had a doctor's appointment. Googel's Assistant didn't return to work until 2:00 PM

which pushed Mr. Washington's hour lunch break from 2:00 to 3:00 PM. Before taking his lunch, Mr.

Washington went upstairs to notify Walsh and his Assistant, but neither were back from their lunch breaks.

90.     Mr. Washington arrived to the training session at 3:00 PM and was trained for

approximately 15 minutes by Goins. At the end of the session, Goins asked Walsh if there was anything she left

out, in which Walsh mentioned to Mr. Washington that he didn't like the fact that he showed up late to his

training session. Mr. Washington explained to Walsh why he was "late" and that it was not "reflective" of his

work performance or punctuality – as he was one of the first to show up at the office every day.

91.     During the week that Mr. Washington worked with Walsh, on August 6, 2009, Mr.

Washington was asked over the phone by Walsh (who was out of the office), to check his Sent email folder to

verify that he sent out a ticket confirmation for a Broadway show for a buyer. While searching Walsh's Sent

folder, Mr. Washington came across two emails with "Marcus Washington" in the subject heading dated July

31, 2009.

92.     In the first email dated at 4:27 PM, Walsh wrote to Winiarski as an "FYI" that instead of

showing up at 2:30 PM, Mr. Washington "finally dropped by a few hours later" and after telling Mr.

Washington that it was unacceptable to pull a "no show no call," Walsh's "statement didn't seem to register"

and Mr. Washington "certainly didn't apologize."

93.     The second email – similar in structure and language to the first – was dated approximately

twenty minutes later at 4:46 PM and sent to the entire NYHR group which included Winiarski, Meade and Pat

Galloway. Instead of saying Mr. Washington was a "few hours late," it then stated that "Marcus didn't arrive at

2:30 – he finally dropped by at about 3:00 PM." Walsh also removed the part that it didn't seem to "register"

with Mr. Washington and that he "certainly didn't apologize."

94.     Walsh made a consciously deliberate and intentional decision to engage in libel and distort the facts, but made this error in writing. In both emails, Walsh also states that Mr. Washington had an appointment on "Thursday, July 29th" – a day that never existed. The 29th of July happened on a Wednesday and Mr. Washington's appointment with Walsh and his Assistant were on the same day he wrote the email to Winiarski and the NYHR group. Also, a "few hours" hadn't even passed at the time Walsh wrote and sent both emails.

95.     As soon as Mr. Washington discovered the emails, he contacted the new head of HR for WME Entertainment – Carole Katz – who is based in Beverly Hills. Mr. Washington spoke with Katz for approximately 10 minutes about his frustrations with how he was being treated and his belief that he was being "set up to fail" by members of HR and other employees within the Company, and that this email was further proof of that. Mr. Washington expressed trust concerns with Meade, Winiarski and Galloway and asked Katz to not speak to anyone in the Human Resources staff to see how they would respond to Walsh's emails. After the phone conversation, Mr. Washington wrote an email "for documentation purposes" to Katz reiterating what was stated over the phone.

96.     Although there was no response to Walsh's emails by Winiarski, Meade or Galloway, Mr. Washington found out in a meeting with Katz on April 8, 2010 that Katz discussed the emails with them although he'd asked her not to.

97.     In or around the first couple months of 2010, Mr. Washington and another Floater assigned to work for Walsh discovered another email that was written by Winiarski to Walsh in between the first and second emails directing Walsh to send the email to the entire NYHR team and that Winiarski would make changes to the first email and leave it in his office.

**III. "Black Guy" Comment**

98.     Due to the professional environment in which Mr. Washington worked – one that is filled with highly educated and sophisticated individuals, including lawyers – there was only one instance of a racially offensive comment made by one of the Agents directly to Mr. Washington. It's common knowledge

that there's no need to blatantly discriminate when one can accomplish the same goal with seemingly unbiased, discrete and subtle methods.

99.      On March 8, 2010, Mr. Washington was sitting at a Floater workstation in the theater department when theater Agent Jonathan Lomma arrived to work. After he walked by Mr. Washington, he stopped two desks down to speak to the Assistant of Susan Weaving (Amy Stein) about a play they'd seen the night before. He then walked down the hall to his office after speaking with his Floater to get her thoughts on the same play. From his office, he yelled, "Larnelle!? Larnelle!?" Both Stein and his Floater stated, "That's Marcus," in which Lomma replied loudly, "Oh! I saw a black guy sitting there, I figured it was Larnelle."

100.     Prior to this incident, various employees would continually call Mr. Washington "Larnelle," while calling Larnelle "Marcus," although neither looked, dressed or acted alike. Both Stein and Lomma's Floater let out a gasp of disbelief when the statement was made. Mr. Washington couldn't believe Lomma would make a racially offensive and insensitive comment, let alone, yell it from his office. Mr. Washington felt embarrassed and humiliated, as it further confirmed to Mr. Washington that he, as well as Larnelle, were nothing short of tokens and essentially irrelevant – to the point that even their names were meaningless.

101.     A few minutes later, Lomma approached Mr. Washington trying to offer an apology and attempted to downplay his comment, in which Mr. Washington stated, "Jonathan. Today is not the day. You need to get out of my face," in which Lomma left.

102.     The next week, Mr. Washington was assigned to float for Lomma. That morning when Lomma arrived to the office and saw that Mr. Washington had been assigned to float for him, he tried again to make amends for his comment. He asked Mr. Washington if he remembered what was said the week before. Mr. Washington stated that he didn't remember (although he did). Lomma then proceeded to tell Mr. Washington what he said, although it was different from his original statement.